BOARD OF DIRECTORS OF AJAX ELECTROTHERMIC COR-
PORATION, PLAINTIFF-RESPONDENT, v. THE FIRST
NATIONAL BANK OF PRINCETON, *ET AL.*, DEFEND-
ANTS-RESPONDENTS, AND DAVID D. FURMAN, ATTOR-
NEY GENERAL OF NEW JERSEY, DEFENDANT-APPEL-
LANT.

Argued October 25, 1960—Decided November 21, 1960.

458

---

*Mr. Murry Brochin,* Deputy Attorney General, argued the cause for the defendant-appellant (*Mr. David D. Furman,* Attorney General, *pro se; Mr. Morlon I. Greenberg,* Deputy Attorney General, on the brief).

*Mr. H. Collin Minton, Jr.,* argued the cause for the plaintiff-respondent and defendants-respondents.

*Messrs. Minton, Dinsmore & Bohlinger,* attorneys for plaintiff-respondent, Board of Directors of Ajax Electrothermic Corporation (*Mr. H. Collin Minton, Jr.,* on the brief).

*Messrs. Scammell & Reese,* attorneys for defendant-respondent, First Group of Employees (*Mr. J. Mitchell Reese,* on the brief).

*Messrs. Backes & Backes,* attorneys for defendant-respondent, Second Group of Employees (*Mr. Herbert W. Backes,* on the brief).

*Messrs. Katzenbach, Gildea & Rudner,* attorneys for defendant-respondent, Third Group of Employees (*Mr. Horace J. Farlee,* on the brief).

*Mr. John F. McCarthy, Jr.,* attorney for defendant-respondent, Edith Northrup (*Mr. Peter T. Bacsik,* on the brief).

*Mr. Maurice E. Gold,* attorney for defendant-respondent, First Trenton National Bank, Administrator *c. l. a.* of the Estate of George F. Applegate, deceased.

*Messrs. Abbotts & Abbotts* and *Mr. John Abbotts,* attorneys for defendant-respondent Frank Chestnut.

*Messrs. Scott, Fox & Walsh* and *Mr. Frank V. Walsh, Jr.,* attorneys for defendant-respondent Howard F. Tomlinson, individually, etc.

*Messrs. Mason, Griffin, Moore & Cook,* attorneys for defendant-respondent, The First National Bank of Princeton, trustee of trust under last will and testament of Edwin Fitch Northrup, deceased (*Mr. Ralph S. Mason,* of counsel).

The opinion of the court was delivered by

PROCTOR, J. This is an appeal from a judgment of the Superior Court, Chancery Division, permitting acceleration and termination of a testamentary trust. The Attorney General took an appeal which this court certified on its own motion before hearing in the Appellate Division.

On April 29, 1940 Edwin Fitch Northrup died, leaving a will, dated January 31, 1939, which established a trust with net income to go to his wife for life. She died on May 8, 1945. The remainder of the will provides in pertinent part:

"TENTH: I direct that upon the death of my wife, Margaret J. S. Northrup, that an amount not exceeding One Hundred and Fifty ($150.00) monthly be paid to my sister, Edith Northrup, during her natural life, out of the net income from the aforesaid trust and not otherwise, and that the balance of the net income from the trust herein created be paid over to the Ajax Electrothermic Corporation, to be used directly and not indirectly for the sole benefit of the officials and employees of the Ajax Electrothermic Corporation, such determination and distribution to be made by the Board of Directors of said Corporation.

ELEVENTH: I direct that upon the deaths of my wife, Margaret J. S. Northrup, and my sister, Edith Northrup, that the trust herein

created shall terminate and the balance of the interest and the principal remaining be paid over to the Ajax Electrothermic Corporation, absolutely, to be used directly and not indirectly for the sole benefit of the officials and employees of the Ajax Electrothermic Corporation, such determination and distribution to be made by the Board of Directors of said Corporation.

TWELFTH: In the event the Ajax Electrothermic Corporation is merged, amalgamated, reorganized, sold, or combined with some other corporation or institution, then, upon the occasion of any of the aforesaid events of this paragraph, I direct that my trustee shall determine to the best of its ability if the personnel of the aforesaid Ajax Electrothermic Corporation remains intact, substantially as a whole, either independently, or in connection with others; and upon such determination pay over to such organization, institution, or otherwise, funds and property as herein provided in substitution to the said Ajax Electrothermic Corporation. It is definitely understood that any action of my executor and trustee under the provision of this paragraph shall be final without liability or responsibility to any party or parties whatsoever.

THIRTEENTH: I direct, in the event the said Ajax Electrothermic Corporation, or such other parties as determined by my executor and trustee entitled to benefits hereunder in accordance with item tenth hereof cannot be assembled or ascertained, refuses or is prohibited to accept any or all of the benefits hereby created, that my estate shall be disposed of as follows; namely: That my executor and trustee is hereby authorized to give and bequeath the rest, residue and remainder of my estate to some worthy charity, or charities, at the discretion of my executor and trustee, except that the term charity, or charities, as used herein shall not be construed to include any Church, or religious organization of any kind whatever. It is definitely understood that any action of my executor and trustee under the provision of this paragraph shall be final, without liability or responsibility to any party, or parties, whatever."

The testator's sister, Edith Northrup, is still alive.

In 1950, the Ajax Electrothermic Corporation (Ajax) and Edith Northrup brought an action against the trustee, First National Bank of Princeton, seeking acceleration and termination of the trust. It was alleged that Ajax had purchased for Edith Northrup an annuity contract paying $200 per month, in return for which she gave to the trustee a release of her $150 per month life interest in the trust. The Chancery Division dismissed the action for failure to join Ajax employees and the Attorney General as representative of the unnamed charities. This court affirmed the judg-

ment of the Chancery Division on the alternative grounds that (1) future Ajax employees and the Attorney General were indispensable parties, and (2) acceleration at that time would be contrary to the testator's intent. *Ajax Electrothermic Corp. v. First Nat. Bank of Princeton,* 7 *N. J.* 82 (1951).

In a subsequent proceeding, the Chancery Division entered a judgment by consent on January 10, 1952, approving a plan for distribution of the balance of the net trust income, after payment of Edith Northrup's $150 per month, among officials and employees of Ajax. The present action arose on a motion by the Board of Directors of Ajax to modify the judgment of January 10, 1952, so as now to permit acceleration and termination of the trust. All officials and employees of Ajax, Edith Northrup, and the Attorney General were notified of the present motion and joined as defendants. At a hearing on the motion the evidence was as follows:

On April 30, 1959 Ajax sold its assets to Magnethermic Corporation. Ajax is now an investment company operating under the name of Ajax Electrothermic Investments, Inc., and no longer engages in manufacturing operations. The contract of sale provided that, insofar as possible, Ajax personnel were to be employed in their former capacities with the purchaser-corporation. Ajax personnel are now employed by Magnethermic; none remains in the employ of Ajax. At the time of the sale, former officials and employees of Ajax "remained intact, substantially as a whole," so that they could be readily identified as a group within Magnethermic. These persons are now being transferred to various divisions of Magnethermic and no longer "remain intact, substantially as a whole."

After the sale to Magnethermic, directors of Ajax Electrothermic Investments, Inc., passed a resolution providing for the distribution of the trust *corpus* to those employed by Ajax on April 30, 1959 (the date of sale) and who had been employed for a calendar year during the period from May 8, 1945 to April 30, 1959. The plan also included provisions

for those employed for a calendar year during that period who had retired or died. All parties but the Attorney General have agreed to the acceleration and the plan of distribution; the surviving life tenant, Edith Northrup, has agreed to accept an annuity of $200 per month in lieu of her interest in the trust.

As mentioned above, the trial court granted plaintiff's motion, and the judgment of January 10, 1952, was modified to provide for the termination of the trust and distribution of the *corpus* according to the plan approved by the former officials and employees of Ajax.

The Attorney General alone appealed as the representative of the unnamed charities having a contingent interest under paragraph 13. In his brief, he urges reversal of the judgment below on two grounds: (1) acceleration of the trust is barred by the judgment of this court in the prior appeal, and (2) acceleration would result in a distribution contrary to the testator's intent.

I.

### Effect of This Court's Prior Determination.

In affirming the dismissal of the original action for acceleration, we held that the trust could not be accelerated at that time for two reasons. First, acceleration would have resulted in a distribution of trust *corpus* contrary to testator's intent. We noted that the testamentary provisions for officials and employees of Ajax were intended to perpetuate the corporation by promoting the individual interests of those who were serving it; and to effectuate such purpose persons employed by Ajax at the death of Edith Northrup were to receive the trust *corpus*. The personnel of Ajax would normally change from time to time; employees at the time of the action might not be employees at the death of Edith Northrup, and those employed at the time of her death might not have been employed at the time of the action. In other words, the remaindermen entitled to the trust *corpus* could not

have been ascertained at the time of the action. Therefore, acceleration and termination of the trust would have resulted in a distribution to persons other than those intended by the testator. 7 *N. J.* 82, at *pp.* 87–88. Second, since the then future employees and unnamed charities had interests in the trust, they were entitled to be represented and heard in any action involving the trust. 7 *N. J.* 82, at *pp.* 89–90. Accordingly, the failure to join such parties was fatal to the action.

In order for our judgment in the prior appeal to raise an estoppel by way of *res judicata* or collateral estoppel, the parties against whom the estoppel is asserted or their privies must have been parties to the original action for acceleration. See *Bango v. Ward,* 12 *N. J.* 415, 420 (1953); *Templeton v. Scudder,* 16 *N. J. Super.* 576 (*App. Div.* 1951); *Restatement, Judgments* § 93 (1942). The present action undoubtedly includes as parties Ajax employees who were not employed by Ajax at the time of the first action and not represented therein. This court noted in its prior opinion that the interest of the employees who were then associated with the corporation conflicted with the interest of those who might become employees in the then future. It was this conflict of interest which was in part the ground for affirmance of the dismissal for failure to join indispensable parties. If the interests of these two employee-groups were in conflict at the time of the first action, they are not privies within the meaning of the *res judicata* or collateral estoppel doctrines. Since officials and employees who are parties to this suit were not parties to the first suit and are not privies to parties in the first suit, this court's prior judgment cannot operate as *res judicata* or collateral estoppel as to such officials and employees. We expressly noted that the then future employees could not be so barred:

"The concurring opinion goes on the theory that we cannot determine the question of the acceleration and termination of the trust without affording the officials and employees of Ajax and the

Attorney General a hearing. Our ruling, however, is not adverse to the future officials and employees of Ajax or to the charities, and the present officials and employees have been substantially though not technically represented by the corporation. *In these circumstances, we, of course, concede that they are not bound by our views on the question of the acceleration and termination of the trust,* which we have necessarily considered in reaching our decision as to the parties entitled to be heard; at the same time we hope we may be avoiding unnecessary future litigation." (Emphasis added) 7 *N. J.* 82, at *p.* 90.

For another reason our prior judgment cannot raise an estoppel against Ajax personnel who are parties to this action and who were present or future employees of Ajax at the time of the prior action. An estoppel by way of *res judicata* or collateral estoppel cannot be raised in a subsequent action if the later action arises on a new state of facts not in issue in the first action, even if the same property is the subject matter of both actions. *Bennett v. Fidelity Union Trust Co.,* 123 *N. J. Eq.* 198 (*Ch.* 1939); *Lasasso v. Lasasso,* 1 *N. J.* 324 (1949); 50 *C. J. S. Judgments* § 735, *p.* 232, *n.* 74 (1947) (collecting cases); 30 *Am. Jur. Judgments* § 206, *p.* 943, *n.* 20 (1940) (collecting cases); Annotation 39 *L. R. A.* (*N. S.*) 972, 974 (1912) (collecting cases). In *Bennett v. Fidelity Union Trust Co., supra,* plaintiffs-remaindermen, having obtained an unconditional release from the life tenant, sought acceleration of a trust. In a prior action for acceleration, where the life tenant had given a conditional release, it was held that the remainder was not distributable until the life tenant's death. Defendant in the second suit pleaded the first judgment as *res judicata.* The court rejected the defense and allowed acceleration, saying:

"One of * * * [the] *contentions is that the determination that the remainder was not distributable until the wife's death, made in the prior case between the same parties * * * is res adjudicata in the instant case. Clearly this is not so. That was an adjudication with respect to the factual situation at that time; it cannot be res adjudicata with respect to the entirely different factual situation before the court in the present case."*

In the present case events subsequent to rendition of this court's opinion in the first action have created a new legal situation. The assets of Ajax have been sold; Ajax has ceased operation as a manufacturing concern; and the former employees of Ajax are being transferred to various divisions of the purchaser-corporation. Because Ajax ceased to exist on April 30, 1959, no persons newly employed since that date can qualify as beneficiaries under the trust. Thus the class of employees entitled to share in the trust *corpus* was closed as of that date. The effect of the sale of Ajax's assets and consequent closing of the class of employee-beneficiaries was not before the court in the first action. The sale of Ajax and subsequent absorption of its employees into the purchaser-corporation have so changed the question for decision that the prior determination of this court cannot raise an estoppel.

## II.

### WOULD ACCELERATION AND TERMINATION OF THE TRUST AT THIS TIME BE CONTRARY TO TESTATOR'S INTENT?

When a trust is created under which income is payable to a person for life and on his death the *corpus* is payable to others, the beneficiaries, if they all consent, can compel acceleration and termination of the trust, in the absence of some controlling equity or an intention of the testator to the contrary. *Ajax Electrothermic Corp. v. First Nat. Bank of Princeton,* 7 *N. J.* 82, at *p.* 87 (1951) (collecting N. J. cases); 3 *Scott, Trusts* § 337.1 (1956); 4 *Scott, op. cit. supra,* § 412.1 (1956); 1A *Bogert, Trusts and Trustees* § 173, *p.* 136–37 (1951); *Restatement, Trusts* § 337 (1942); *Annotations* 45 *A. L. R.* 743, 744 (1926); 123 *A. L. R.* 1427, 1433 (1939); 163 *A. L. R.* 852, 855 (1946). The Attorney General advances no controlling equity; he relies on the argument that to accelerate the

trust now would defeat the testator's intent. Therefore, the basic question to be resolved is: What does the will indicate the testator intended to happen to the trust funds after Ajax was sold to another corporation? That he contemplated a sale is apparent. Paragraph 12 of the will provides that if Ajax is "merged, amalgamated, reorganized, sold, or combined with some other corporation or institution, then, upon the occasion of any of the aforesaid events of this paragraph, I direct that my trustee shall determine to the best of its ability if the personnel of the aforesaid Ajax Electrothermic Corporation remains intact, substantially as a whole, either independently, or in connection with others; and upon such determination * * *" pay over benefits due under the trust. Paragraph 13 provides that if any beneficiaries "cannot be assembled or ascertained, refuses or is prohibited to accept * * * [the trust funds]," the funds are to go to charities named by the trustee. Appellant argues that under paragraph 12, after the sale of Ajax, the employees must remain identifiable as a group in the purchaser-corporation at the time trust benefits fall due under other paragraphs of the will. This interpretation, he argues, is reenforced by paragraph 13. Appellant apparently reads "assembled or ascertained" in paragraph 13 as synonymous with "remains intact, substantially as a whole" in paragraph 12, and regards both paragraphs 12 and 13 as subordinate to other paragraphs of the will. Thus, he urges that since the officials and employees are not entitled to distribution of the trust *corpus* under paragraph 11 until the death of Edith Northrup, and must be identifiable as a group after sale under paragraph 12, they are not entitled to the *corpus* under paragraph 13 unless they are identifiable as a group within the purchaser-corporation at the death of Edith Northrup. Appellant concludes that to accelerate now would thus contravene testator's intent. He also argues that since the former Ajax officials and employees are now being transferred to various divisions of Magnethermic, they are not presently identifiable as a group and therefore income

payments must go under paragraph 13 to the unnamed charities. Presumably the employees will be even less identifiable as a group when Edith Northrup dies, in which case the *corpus* would also go to the charities.

We do not agree with the appellant's construction of the will. Paragraph 12 provides that "upon the occasion of any of the aforesaid events [referring here to sale]" the trustee is to determine whether the former personnel of Ajax "remains intact, substantially as a whole" and, if so, pay over trust benefits. The time at which the trustee is directed to determine whether the employees remain identifiable as a group is expressly stated to be the time of sale. Nothing is said in paragraph 12 about group identification at times subsequent to the sale as a prerequisite to qualification for trust benefits. On the face of this language alone, it would seem that if the employees are identifiable as a group at the time of sale, their rights to trust benefits become fixed, and subsequent dispersion among various divisions of the purchaser-corporation cannot deprive them of trust benefits. The language of paragraph 13, which provides for the contingent gift over to charities, supports this construction. The testator did not say that moneys were to go to the charities if Ajax personnel did not "remain intact, substantially as a whole." Having used that language in paragraph 12 to establish the criterion for benefits in the event of a corporate sale, one would expect that the same language would be used in paragraph 13 if group inseparability after sale was intended as a prerequisite to receiving income during Edith Northrup's life and the *corpus* at her death. Instead, testator used the words "cannot be assembled or ascertained" in paragraph 13. "Assembled or ascertained" seems to refer to whether persons entitled to trust benefits can be found by the trustee. In addition, paragraph 13 presumes that those who cannot be assembled or ascertained are those who the trustee has determined are already entitled to benefits under the trust; for the will says "in the event * * * such parties entitled to

benefits * * * cannot be assembled or ascertained, refuses or is prohibited to accept any and all of the benefits." Clearly, the refusal to accept cannot be a prerequisite to qualification for trust benefits. The juxtaposition of the phrase "assembled or ascertained" with "refuses * * * to accept" indicates that assembling or ascertaining was likewise not intended to be a prerequisite to qualification for trust benefits.

Our construction of paragraphs 12 and 13 is supported by other provisions of the will. It is clear that the primary objects of the testator's beneficence were his wife, his sister, and the officials and employees of Ajax. The entire structure of the trust indicates that it was set up to benefit these people. The gift over to the charities seems almost an afterthought, included perhaps to avoid the unlikely event of an intestacy. The testator's lack of real concern for the charities is revealed by his failure to designate the charities to receive the gift over. It is apparent that the testator was interested, after providing for his family, in rewarding the continued loyalty of Ajax officials and employees who worked to make his corporation a success. Since that corporation no longer exists, having been sold as expressly contemplated by the testator, withholding trust benefits from the employees cannot encourage continued loyalty. The testator must have realized that a purchaser-corporation could not be reasonably expected to preserve the former Ajax officials and employees as a recognizable group within its organization indefinitely. This being so, and in light of the testator's overall purpose to reward his former officials and employees for their loyalty to Ajax, which no longer exists, we find it difficult to believe that the testator intended to deprive them of trust benefits when they are involuntarily dispersed among the various divisions of a stranger purchaser-corporation.

For the above reasons, we conclude that the testator did not intend to require that the Ajax officials and employees maintain their group identification after the sale of Ajax

until the death of Edith Northrup in order to qualify for distribution of the trust income and *corpus*.

We conclude that acceleration and termination of the trust at this time would not frustrate the testator's intent. The class of employees who can qualify as beneficiaries is closed; former Ajax employees remained "intact, substantially as a whole" at the time of sale; all interested parties are represented in the suit; and all except the Attorney General have agreed to termination of the life estate and distribution of the *corpus*. Accordingly, the judgment of the Chancery Division accelerating and terminating the trust is affirmed.

HALL, J., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices FRANCIS, PROCTOR, HALL and SCHETTINO—5.

*For reversal*—None.